Justice THOMAS, concurring.
I continue to believe that Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and Faragher v. Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), were wrongly decided. See ante, at 2458 - 2459.
*451 However, I join the opinion because it provides the narrowest and most workable rule for when an employer may be held vicariously liable for an employee's harassment.
Justice GINSBURG, with whom Justice BREYER, Justice SOTOMAYOR, and Justice KAGAN join, dissenting.
In Faragher v. Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), this Court held that an employer can be vicariously liable under Title VII of the Civil Rights Act of 1964 for harassment by an employee given supervisory *2455 authority over subordinates. In line with those decisions, in 1999, the Equal Employment Opportunity Commission (EEOC) provided enforcement guidance "regarding employer liability for harassment by supervisors based on sex, race, color, religion, national origin, age, disability, or protected activity." EEOC, Guidance on Vicarious Employer Liability For Unlawful Harassment by Supervisors, 8 BNA FEP Manual 405:7651 (Feb. 2003) (hereinafter EEOC Guidance). Addressing who qualifies as a supervisor, the EEOC answered: (1) an individual authorized "to undertake or recommend tangible employment decisions affecting the employee," including "hiring, firing, promoting, demoting, and reassigning the employee"; or (2) an individual authorized "to direct the employee's daily work activities." Id., at 405:7654.
The Court today strikes from the supervisory category employees who control the day-to-day schedules and assignments of others, confining the category to those formally empowered to take tangible employment actions. The limitation the Court decrees diminishes the force of Faragher and Ellerth, ignores the conditions under which members of the work force labor, and disserves the objective of Title VII to prevent discrimination from infecting the Nation's workplaces. I would follow the EEOC's Guidance and hold that the authority to direct an employee's daily activities establishes supervisory status under Title VII.
*452 I
A
Title VII makes it "an unlawful employment practice for an employer" to "discriminate against any individual with respect to" the "terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). The creation of a hostile work environment through harassment, this Court has long recognized, is a form of proscribed discrimination. Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) ; Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64-65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).
What qualifies as harassment? Title VII imposes no "general civility code." Oncale, 523 U.S., at 81, 118 S.Ct. 998. It does not reach "the ordinary tribulations of the workplace," for example, "sporadic use of abusive language" or generally boorish conduct. B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992). See also 1 B. Lindemann & P. Grossman, Employment Discrimination Law 1335-1343 (4th ed. 2007) (hereinafter Lindemann & Grossman). To be actionable, charged behavior need not drive the victim from her job, but it must be of such severity or pervasiveness as to pollute the working environment, thereby "alter[ing] the conditions of the victim's employment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).
In Faragher and Ellerth, this Court established a framework for determining when an employer may be held liable for its employees' creation of a hostile work environment. Recognizing that Title VII's definition of "employer" includes an employer's "agent[s]," 42 U.S.C. § 2000e(b), the Court looked to agency law for guidance in formulating liability standards. Faragher, 524 U.S., at 791, 801, 118 S.Ct. 2275; Ellerth, 524 U.S., at 755-760, 118 S.Ct. 2257. In particular, the Court drew upon § 219(2)(d) of the Restatement (Second) of Agency (1957), *453 which makes an employer liable for the conduct of an employee, even when that employee acts beyond *2456 the scope of her employment, if the employee is "aided in accomplishing" a tort "by the existence of the agency relation." See Faragher, 524 U.S., at 801, 118 S.Ct. 2275; Ellerth, 524 U.S., at 758, 118 S.Ct. 2257.
Stemming from that guide, Faragher and Ellerth distinguished between harassment perpetrated by supervisors, which is often enabled by the supervisor's agency relationship with the employer, and harassment perpetrated by co-workers, which is not similarly facilitated. Faragher, 524 U.S., at 801-803, 118 S.Ct. 2275; Ellerth, 524 U.S., at 763-765, 118 S.Ct. 2257. If the harassing employee is a supervisor, the Court held, the employer is vicariously liable whenever the harassment culminates in a tangible employment action. Faragher, 524 U.S., at 807-808, 118 S.Ct. 2275; Ellerth, 524 U.S., at 764-765, 118 S.Ct. 2257. The term "tangible employment action," Ellerth observed, "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id ., at 761, 118 S.Ct. 2257. Such an action, the Court explained, provides "assurance the injury could not have been inflicted absent the agency relation." Id., at 761-762, 118 S.Ct. 2257.
An employer may also be held vicariously liable for a supervisor's harassment that does not culminate in a tangible employment action, the Court next determined. In such a case, however, the employer may avoid liability by showing that (1) it exercised reasonable care to pre-vent and promptly correct harassing behavior, and (2) the complainant unreasonably failed to take advantage of preventative or corrective measures made available to her. Faragher, 524 U.S., at 807, 118 S.Ct. 2275; Ellerth, 524 U.S., at 765, 118 S.Ct. 2257. The employer bears the burden of establishing this affirmative defense by a preponderance of the evidence. Faragher, 524 U.S., at 807, 118 S.Ct. 2275; Ellerth, 524 U.S., at 765, 118 S.Ct. 2257.
In contrast, if the harassing employee is a co-worker, a negligence standard applies. To satisfy that standard, the *454 complainant must show that the employer knew or should have known of the offensive conduct but failed to take appropriate corrective action. See Faragher, 524 U.S., at 799, 118 S.Ct. 2275; Ellerth, 524 U.S., at 758-759, 118 S.Ct. 2257. See also 29 CFR § 1604.11(d) (2012) ; EEOC Guidance 405:7652.
B
The distinction Faragher and Ellerth drew between supervisors and co-workers corresponds to the realities of the workplace. Exposed to a fellow employee's harassment, one can walk away or tell the offender to "buzz off." A supervisor's slings and arrows, however, are not so easily avoided. An employee who confronts her harassing supervisor risks, for example, receiving an undesirable or unsafe work assignment or an unwanted transfer. She may be saddled with an excessive workload or with placement on a shift spanning hours disruptive of her family life. And she may be demoted or fired. Facing such dangers, she may be reluctant to blow the whistle on her superior, whose "power and authority invests his or her harassing conduct with a particular threatening character." Ellerth, 524 U.S., at 763, 118 S.Ct. 2257. See also Faragher, 524 U.S., at 803, 118 S.Ct. 2275; Brief for Respondent 23 ("The potential threat to one's livelihood or working conditions will make the victim think twice before resisting harassment or fighting back."). In short, as Faragher and Ellerth recognized, harassment by supervisors is more likely *2457 to cause palpable harm and to persist unabated than similar conduct by fellow employees.
II
While Faragher and Ellerth differentiated harassment by supervisors from harassment by co-workers, neither decision gave a definitive answer to the question: Who qualifies as a supervisor? Two views have emerged. One view, in line with the EEOC's Guidance, counts as a supervisor anyone with authority to take tangible employment actions or to direct an employee's daily work activities. E.g., Mack v. Otis *455 Elevator Co., 326 F.3d 116, 127 (C.A.2 2003) ; Whitten v. Fred's, Inc., 601 F.3d 231, 246 (C.A.4 2010) ; EEOC Guidance 405:7654. The other view ranks as supervisors only those authorized to take tangible employment actions. E.g., Noviello v. Boston, 398 F.3d 76, 96 (C.A.1 2005) ; Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1034 (C.A.7 1998) ; Joens v. John Morrell & Co., 354 F.3d 938, 940-941 (C.A.8 2004).
Notably, respondent Ball State University agreed with petitioner Vance and the United States, as amicus curiae, that the tangible-employment-action-only test "does not necessarily capture all employees who may qualify as supervisors." Brief for Respondent 1. "[V]icarious liability," Ball State acknowledged, "also may be triggered when the harassing employee has the authority to control the victim's daily work activities in a way that materially enables the harassment." Id., at 1-2.
The different view taken by the Court today is out of accord with the agency principles that, Faragher and Ellerth affirmed, govern Title VII. See supra, at 2439 - 2440. It is blind to the realities of the workplace, and it discounts the guidance of the EEOC, the agency Congress established to interpret, and superintend the enforcement of, Title VII. Under that guidance, the appropriate question is: Has the employer given the alleged harasser authority to take tangible employment actions or to control the conditions under which subordinates do their daily work? If the answer to either inquiry is yes, vicarious liability is in order, for the superior-subordinate working arrangement facilitating the harassment is of the employer's making.
A
Until today, our decisions have assumed that employees who direct subordinates' daily work are supervisors. In Faragher, the city of Boca Raton, Florida, employed Bill Terry and David Silverman to oversee the city's corps of *456 ocean lifeguards. 524 U.S., at 780, 118 S.Ct. 2275. Terry and Silverman "repeatedly subject[ed] Faragher and other female lifeguards to uninvited and offensive touching," and they regularly "ma[de] lewd remarks, and [spoke] of women in offensive terms." Ibid. (internal quotation marks omitted). Terry told a job applicant that "female lifeguards had sex with their male counterparts," and then "asked whether she would do the same." Id., at 782, 118 S.Ct. 2275. Silverman threatened to assign Faragher to toilet-cleaning duties for a year if she refused to date him. Id., at 780, 118 S.Ct. 2275. In words and conduct, Silverman and Terry made the beach a hostile place for women to work.
As Chief of Boca Raton's Marine Safety Division, Terry had authority to "hire new lifeguards (subject to the approval of higher management), to supervise all aspects of the lifeguards' work assignments, to engage in counseling, to deliver oral reprimands, and to make a record of any such discipline." Id., at 781, 118 S.Ct. 2275. Silverman's duties as a Marine Safety lieutenant included "making the lifeguards'
*2458 daily assignments, and ... supervising their work and fitness training." Ibid. Both men "were granted virtually unchecked authority over their subordinates, directly controlling and supervising all aspects of Faragher's day-to-day activities." Id., at 808, 118 S.Ct. 2275 (internal quotation marks and brackets omitted).
We may assume that Terry would fall within the definition of supervisor the Court adopts today. See ante, at 2443.[1]
*457 But nothing in the Faragher record shows that Silverman would. Silverman had oversight and assignment responsibilities-he could punish lifeguards who would not date him with full-time toilet-cleaning duty-but there was no evidence that he had authority to take tangible employment actions. See Faragher, 524 U.S., at 780-781, 118 S.Ct. 2275. Holding that Boca Raton was vicariously liable for Silverman's harassment, id., at 808-809, 118 S.Ct. 2275, the Court characterized him as Faragher's supervisor, see id ., at 780, 118 S.Ct. 2275, and there was no dissent on that point, see id., at 810, 118 S.Ct. 2275 (THOMAS, J., dissenting).
Subsequent decisions reinforced Faragher 's use of the term "supervisor" to encompass employees with authority to direct the daily work of their victims. In Pennsylvania State Police v. Suders, 542 U.S. 129, 140, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004), for example, the Court considered whether a constructive discharge occasioned by supervisor harassment ranks as a tangible employment action. The harassing employees lacked authority to discharge or demote the complainant, but they were "responsible for the day-to-day supervision" of the workplace and for overseeing employee shifts. Suders v. Easton, 325 F.3d 432, 450, n. 11 (C.A.3 2003). Describing the harassing employees as the complainant's "supervisors," the Court proceeded to evaluate the complainant's constructive discharge claim under the Ellerth and Faragher framework. Suders, 542 U.S., at 134, 140-141, 124 S.Ct. 2342.
It is true, as the Court says, ante, at 2447, and n. 11, that Faragher and later cases did not squarely resolve whether an employee without power to take tangible employment actions may nonetheless qualify as a supervisor. But in laboring to establish that Silverman's supervisor status, undisputed in Faragher, is not dispositive here, the Court misses the forest for the trees. Faragher illustrates an all-too-plain reality: A supervisor with authority to control subordinates' daily work is no less aided in his harassment than is a supervisor *458 with authority to fire, demote, or transfer. That Silverman could threaten Faragher with toilet-cleaning duties while Terry could orally reprimand her was inconsequential in Faragher, and properly so. What mattered was that both men took advantage of the power vested in them as agents of Boca Raton to facilitate their abuse. See Faragher, 524 U.S., at 801, 118 S.Ct. 2275 (Silverman and Terry "implicitly threaten[ed] to misuse their supervisory *2459 powers to deter any resistance or complaint."). And when, assisted by an agency relationship, in-charge superiors like Silverman perpetuate a discriminatory work environment, our decisions have appropriately held the employer vicariously liable, subject to the above-described affirmative defense. See supra, at 2439 - 2440.
B
Workplace realities fortify my conclusion that harassment by an employee with power to direct subordinates' day-to-day work activities should trigger vicarious employer liability. The following illustrations, none of them hypothetical, involve in-charge employees of the kind the Court today excludes from supervisory status.[2]
Yasharay Mack : Yasharay Mack, an African-American woman, worked for the Otis Elevator Company as an elevator mechanic's helper at the Metropolitan Life Building in New York City. James Connolly, the "mechanic in charge" and the senior employee at the site, targeted Mack for abuse. He commented frequently on her "fantastic ass," "luscious lips," and "beautiful eyes," and, using deplorable racial epithets, opined that minorities and women did not "belong in the business." Once, he pulled her on his lap, touched her buttocks, and tried to kiss her while others looked on. Connolly lacked authority to take tangible employment actions *459 against mechanic's helpers, but he did assign their work, control their schedules, and direct the particulars of their workdays. When he became angry with Mack, for example, he denied her overtime hours. And when she complained about the mistreatment, he scoffed, "I get away with everything." See Mack, 326 F.3d, at 120-121, 125-126 (internal quotation marks omitted).
Donna Rhodes : Donna Rhodes, a seasonal highway maintainer for the Illinois Department of Transportation, was responsible for plowing snow during winter months. Michael Poladian was a "Lead Lead Worker" and Matt Mara, a "Technician" at the maintenance yard where Rhodes worked. Both men assembled plow crews and managed the work assignments of employees in Rhodes's position, but neither had authority to hire, fire, promote, demote, transfer, or discipline employees. In her third season working at the yard, Rhodes was verbally assaulted with sex-based invectives and a pornographic image was taped to her locker. Poladian forced her to wash her truck in sub-zero temperatures, assigned her undesirable yard work instead of road crew work, and prohibited another employee from fixing the malfunctioning heating system in her truck. Conceding that Rhodes had been subjected to a sex-based hostile work environment, the Department of Transportation argued successfully in the District Court and Court of Appeals that Poladian and Mara were not Rhodes's supervisors because they lacked authority to take tangible employment actions against her. See Rhodes v. Illinois Dept. of Transp., 359 F.3d 498, 501-503, 506-507 (C.A.7 2004).
Clara Whitten : Clara Whitten worked at a discount retail store in Belton, South Carolina. On Whitten's first day of work, the manager, Matt Green, told her to "give [him] what [he] want[ed]" in order to obtain approval for long weekends off from work. Later, fearing what might transpire, Whitten ignored Green's order to join him in an isolated storeroom. Angered, *2460 Green instructed Whitten to stay late and *460 clean the store. He demanded that she work over the weekend despite her scheduled day off. Dismissing her as " dumb and stupid," Green threatened to make her life a "living hell." Green lacked authority to fire, promote, demote, or otherwise make decisions affecting Whitten's pocketbook. But he directed her activities, gave her tasks to accomplish, burdened her with undesirable work assignments, and controlled her schedule. He was usually the highest ranking employee in the store, and both Whitten and Green considered him the supervisor. See Whitten, 601 F.3d, at 236, 244-247 (internal quotation marks omitted).
Monika Starke : CRST Van Expedited, Inc., an interstate transit company, ran a training program for newly hired truckdrivers requiring a 28-day on-the-road trip. Monika Starke participated in the program. Trainees like Starke were paired in a truck cabin with a single "lead driver" who lacked authority to hire, fire, promote, or demote, but who exercised control over the work environment for the duration of the trip. Lead drivers were responsible for providing instruction on CRST's driving method, assigning specific tasks, and scheduling rest stops. At the end of the trip, lead drivers evaluated trainees' performance with a nonbinding pass or fail recommendation that could lead to full driver status. Over the course of Starke's training trip, her first lead driver, Bob Smith, filled the cabin with vulgar sexual remarks, commenting on her breast size and comparing the gear stick to genitalia. A second lead driver, David Goodman, later forced her into unwanted sex with him, an outrage to which she submitted, believing it necessary to gain a passing grade. See EEOC v. CRST Van Expedited, Inc., 679 F.3d 657, 665-666, 684-685 (C.A.8 2012).
In each of these cases, a person vested with authority to control the conditions of a subordinate's daily work life used his position to aid his harassment. But in none of them would the Court's severely confined definition of supervisor *461 yield vicarious liability for the employer. The senior elevator mechanic in charge, the Court today tells us, was Mack's co-worker, not her supervisor. So was the store manager who punished Whitten with long hours for refusing to give him what he wanted. So were the lead drivers who controlled all aspects of Starke's working environment, and the yard worker who kept other employees from helping Rhodes to control the heat in her truck.
As anyone with work experience would immediately grasp, James Connolly, Michael Poladian, Matt Mara, Matt Green, Bob Smith, and David Goodman wielded employer-conferred supervisory authority over their victims. Each man's discriminatory harassment derived force from, and was facilitated by, the control reins he held. Cf. Burlington N. & S.F.R. Co. v. White, 548 U.S. 53, 70-71, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) ("Common sense suggests that one good way to discourage an employee ... from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable."). Under any fair reading of Title VII, in each of the illustrative cases, the superior employee should have been classified a supervisor whose conduct would trigger vicarious liability.[3]
*2461 C
*462 Within a year after the Court's decisions in Faragher and Ellerth, the EEOC defined "supervisor" to include any employee with " authority to undertake or recommend tangible employment decisions," or with "authority to direct [another] employee's daily work activities." EEOC Guidance 405:7654. That definition should garner "respect proportional to its 'power to persuade.' " United States v. Mead Corp., 533 U.S. 218, 235, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944) ). See also Crawford v. Metropolitan Government of Nashville and Davidson Cty., 555 U.S. 271, 276, 129 S.Ct. 846, 172 L.Ed.2d 650 (2009) (EEOC guidelines merited Skidmore deference); Federal Express Corp. v. Holowecki, 552 U.S. 389, 399-403, 128 S.Ct. 1147, 170 L.Ed.2d 10 (2008) (same); Meritor, 477 U.S., at 65, 106 S.Ct. 2399 (same).[4]
The EEOC's definition of supervisor reflects the agency's "informed judgment" and "body of experience" in enforcing Title VII. Id., at 65, 106 S.Ct. 2399 (internal quotation marks omitted). For 14 years, in enforcement actions and litigation, the EEOC has firmly adhered to its definition. See Brief for United States as Amicus Curiae 28 (citing numerous briefs in the Courts of Appeals setting forth the EEOC's understanding).
In developing its definition of supervisor, the EEOC paid close attention to the Faragher and Ellerth framework. An employer is vicariously liable only when the authority it has delegated enables actionable harassment, the EEOC recognized. EEOC Guidance 405:7654. For that reason, a supervisor's authority must be "of a sufficient magnitude so as to *463 assist the harasser ... in carrying out the harassment." Ibid. Determining whether an employee wields sufficient authority is not a mechanical inquiry, the EEOC explained; instead, specific facts about the employee's job function are critical. Id., at 405:7653 to 405:7654. Thus, an employee with authority to increase another's workload or assign undesirable tasks may rank as a supervisor, for those powers can enable harassment. Id., at 405:7654. On the other hand, an employee "who directs only a limited number of tasks or assignments" ordinarily would not qualify as a supervisor, for her harassing conduct is not likely to be aided materially by the agency relationship. Id., at 405:7655.
In my view, the EEOC's definition, which the Court puts down as "a study in ambiguity," ante, at 2449, has the ring of *2462 truth and, therefore, powerfully persuasive force. As a precondition to vicarious employer liability, the EEOC explained, the harassing supervisor must wield authority of sufficient magnitude to enable the harassment. In other words, the aided-in-accomplishment standard requires "something more than the employment relation itself." Ellerth, 524 U.S., at 760, 118 S.Ct. 2257. Furthermore, as the EEOC perceived, in assessing an employee's qualification as a supervisor, context is often key. See infra, at 2446 - 2447. I would accord the agency's judgment due respect.
III
Exhibiting remarkable resistance to the thrust of our prior decisions, workplace realities, and the EEOC's Guidance, the Court embraces a position that relieves scores of employers of responsibility for the behavior of the supervisors they employ. Trumpeting the virtues of simplicity and administrability, the Court restricts supervisor status to those with power to take tangible employment actions. In so restricting the definition of supervisor, the Court once again shuts from sight the "robust protection against workplace discrimination Congress intended Title VII to secure." Ledbetter v.
*464 Goodyear Tire & Rubber Co., 550 U.S. 618, 660, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007) (GINSBURG, J., dissenting).
A
The Court purports to rely on the Ellerth and Faragher framework to limit supervisor status to those capable of taking tangible employment actions. Ante, at 2459 - 2460, 2464. That framework, we are told, presupposes "a sharp line between co-workers and supervisors." Ante, at 2448. The definition of supervisor decreed today, the Court insists, is "clear," "readily applied," and "easily workable," ante, at 2459 - 2460, 2465, when compared to the EEOC's vague standard, ante, at 2466.
There is reason to doubt just how "clear" and "workable" the Court's definition is. A supervisor, the Court holds, is someone empowered to "take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.' " Ante, at 2433 (quoting Ellerth, 524 U.S., at 761, 118 S.Ct. 2257). Whether reassignment authority makes someone a supervisor might depend on whether the reassignment carries economic consequences. Ante, at 2447, n. 9. The power to discipline other employees, when the discipline has economic consequences, might count, too. Ibid. So might the power to initiate or make recommendations about tangible employment actions. Ante, at 2446, n. 8. And when an employer "concentrates all decisionmaking authority in a few individuals" who rely on information from "other workers who actually interact with the affected employee," the other workers may rank as supervisors (or maybe not; the Court does not commit one way or the other). Ante, at 2452.
Someone in search of a bright line might well ask, what counts as "significantly different responsibilities"? Can any economic consequence make a reassignment or disciplinary action "significant," or is there a minimum threshold? How *465 concentrated must the decisionmaking authority be to deem those not formally endowed with that authority nevertheless " supervisors"? The Court leaves these questions unanswered, and its liberal use of "mights" and "mays," ante, at 2446, n. 8, 2447, n. 9, 2452, dims the light it casts.[5] *2463 That the Court has adopted a standard, rather than a clear rule, is not surprising, for no crisp definition of supervisor could supply the unwavering line the Court desires. Supervisors, like the workplaces they manage, come in all shapes and sizes. Whether a pitching coach supervises his pitchers (can he demote them?), or an artistic director supervises her opera star (can she impose significantly different responsibilities?), or a law firm associate supervises the firm's paralegals (can she fire them?) are matters not susceptible to mechanical rules and on-off switches. One cannot know whether an employer has vested supervisory authority in an employee, and whether harassment is aided by that authority, without looking to the particular working relationship between the harasser and the victim. That is why Faragher and Ellerth crafted an employer liability standard embracive of all whose authority significantly aids in the creation and perpetuation of harassment.
The Court's focus on finding a definition of supervisor capable of instant application is at odds with the Court's ordinary emphasis on the importance of particular circumstances in Title VII cases. See, e.g., Burlington Northern, 548 U.S., at 69, 126 S.Ct. 2405 ("[T]he significance of any given act of retaliation will often depend upon the particular circumstances.");
*466 Harris, 510 U.S., at 23, 114 S.Ct. 367 ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.").[6] The question of supervisory status, no less than the question whether retaliation or harassment has occurred, "depends on a constellation of surrounding circumstances, expectations, and relationships." Oncale, 523 U.S., at 81-82, 118 S.Ct. 998. The EEOC's Guidance so perceives.
B
As a consequence of the Court's truncated conception of supervisory authority, the Faragher and Ellerth framework has shifted in a decidedly employer-friendly direction. This realignment will leave many harassment victims without an effective remedy and undermine Title VII's capacity to prevent workplace harassment.
The negligence standard allowed by the Court, see ante, at 2451, scarcely affords the protection the Faragher and Ellerth framework gave victims harassed by those in control of their lives at work. Recall that an employer is negligent with regard to harassment only if it knew or should have known of the conduct but failed to take appropriate corrective action. See 29 CFR § 1604.11(d) ; EEOC Guidance *2464 405:7652 to 405:7653. It is not uncommon for employers to lack actual or constructive notice of a harassing employee's conduct. See Lindemann & Grossman 1378-1379. An employee may have a reputation as a harasser among those in his vicinity, but if no complaint makes its way up to management, the employer will escape liability under a negligence standard. Id., at 1378. *467 Faragher is illustrative. After enduring unrelenting harassment, Faragher reported Terry's and Silverman's conduct informally to Robert Gordon, another immediate supervisor. 524 U.S., at 782-783, 118 S.Ct. 2275. But the lifeguards were "completely isolated from the City's higher management," and it did not occur to Faragher to pursue the matter with higher ranking city officials distant from the beach. Id., at 783, 808, 118 S.Ct. 2275 (internal quotation marks omitted). Applying a negligence standard, the Eleventh Circuit held that, despite the pervasiveness of the harassment, and despite Gordon's awareness of it, Boca Raton lacked constructive notice and therefore escaped liability. Id., at 784-785, 118 S.Ct. 2275. Under the vicarious liability standard, however, Boca Raton could not make out the affirmative defense, for it had failed to disseminate a policy against sexual harassment. Id., at 808-809, 118 S.Ct. 2275.
On top of the substantive differences in the negligence and vicarious liability standards, harassment victims, under today's decision, are saddled with the burden of proving the employer's negligence whenever the harasser lacks the power to take tangible employment actions. Faragher and Ellerth, by contrast, placed the burden squarely on the employer to make out the affirmative defense. See Suders, 542 U.S., at 146, 124 S.Ct. 2342 (citing Ellerth, 524 U.S., at 765, 118 S.Ct. 2257; Faragher, 524 U.S., at 807, 118 S.Ct. 2275). This allocation of the burden was both sensible and deliberate: An employer has superior access to evidence bearing on whether it acted reasonably to prevent or correct harassing behavior, and superior resources to marshal that evidence. See 542 U.S., at 146, n. 7, 124 S.Ct. 2342 ("The employer is in the best position to know what remedial procedures it offers to employees and how those procedures operate.").
Faced with a steeper substantive and procedural hill to climb, victims like Yasharay Mack, Donna Rhodes, Clara Whitten, and Monika Starke likely will find it impossible to obtain redress. We can expect that, as a consequence of restricting the supervisor category to those formally empowered to take tangible employment actions, victims of workplace *468 harassment with meritorious Title VII claims will find suit a hazardous endeavor.[7]
Inevitably, the Court's definition of supervisor will hinder efforts to stamp out discrimination in the workplace. Because supervisors are comparatively few, and employees are many, "the employer has a greater opportunity to guard against misconduct by supervisors than by common workers," and a greater incentive to "screen [supervisors], train them, and monitor their performance." Faragher, 524 U.S., at 803, 118 S.Ct. 2275. Vicarious liability for employers serves this end. When employers know they will be answerable for the injuries a harassing jobsite boss inflicts, their incentive to provide preventative instruction is heightened. If vicarious liability is confined to supervisors formally empowered to take tangible employment actions, however, employers will *2465 have a diminished incentive to train those who control their subordinates' work activities and schedules, i.e., the supervisors who "actually interact" with employees. Ante, at 2452.
IV
I turn now to the case before us. Maetta Vance worked as substitute server and part-time catering assistant for Ball State University's Banquet and Catering Division. During the period in question, she alleged, Saundra Davis, a catering specialist, and other Ball State employees subjected her to a racially hostile work environment. Applying controlling Circuit precedent, the District Court and Seventh Circuit concluded that Davis was not Vance's supervisor, and reviewed Ball State's liability for her conduct under a negligence standard. 646 F.3d 461, 470-471 (2011) ; App. to Pet.
*469 for Cert. 53a-55a, 59a-60a. Because I would hold that the Seventh Circuit erred in restricting supervisor status to employees formally empowered to take tangible employment actions, I would remand for application of the proper standard to Vance's claim. On this record, however, there is cause to anticipate that Davis would not qualify as Vance's supervisor.[8]
Supervisor status is based on "job function rather than job title," and depends on "specific facts" about the working relationship. EEOC Guidance 405:7654. See supra, at 2445. Vance has adduced scant evidence that Davis controlled the conditions of her daily work. Vance stated in an affidavit that the general manager of the Catering Division, Bill Kimes, was charged with "overall supervision in the kitchen," including "reassign[ing] people to perform different tasks," and "control[ling] the schedule." App. 431. The chef, Shannon Fultz, assigned tasks by preparing "prep lists" of daily duties. Id., at 277-279, 427. There is no allegation that Davis had a hand in creating these prep lists, nor is there any indication that, in fact, Davis otherwise controlled the particulars of Vance's workday. Vance herself testified that she did not know whether Davis was her supervisor. Id., at 198.
True, Davis' job description listed among her responsibilities "[l]ead [ing] and direct[ing] kitchen part-time, substitute, and student employee helpers via demonstration, coaching, and overseeing their work." Id., at 13. And *470 another employee testified to believing that Davis was "a supervisor." Id., at 386. But because the supervisor-status inquiry should focus on substance, not labels or paper descriptions, it is doubtful that this slim evidence would enable Vance to survive a motion for summary judgment. Nevertheless, I would leave it to the Seventh Circuit to decide, under the proper standard for supervisory status, what impact, if any, Davis' job description and the co-worker's statement should have on the determination of Davis' status.[9]
V
Regrettably, the Court has seized upon Vance's thin case to narrow the definition *2466 of supervisor, and thereby manifestly limit Title VII's protections against workplace harassment. Not even Ball State, the defendant-employer in this case, has advanced the restrictive definition the Court adopts. See supra, at 2456 - 2457. Yet the Court, insistent on constructing artificial categories where context should be key, proceeds on an immoderate and unrestrained course to corral Title VII.
Congress has, in the recent past, intervened to correct this Court's wayward interpretations of Title VII. See Lilly Ledbetter Fair Pay Act of 2009, 123 Stat. 5, superseding Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007). See also Civil Rights Act of 1991, 105 Stat. 1071, superseding in part, Lorance v. AT & T Technologies, Inc., 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989) ; Martin v. Wilks, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989) ; Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) ; and Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). The ball is once again in Congress' court to correct the error into which this *471 Court has fallen, and to restore the robust protections against workplace harassment the Court weakens today.
* * *
For the reasons stated, I would reverse the judgment of the Seventh Circuit and remand the case for application of the proper standard for determining who qualifies as a supervisor.

It is not altogether evident that Terry would qualify under the Court's test. His authority to hire was subject to approval by higher management, Faragher v. Boca Raton, 524 U.S. 775, 781, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and there is scant indication that he possessed other powers on the Court's list. The Court observes that Terry was able to "recommen[d]," and "initiat[e]" tangible employment actions. Ante, at 2446, n. 8 (internal quotation marks omitted). Nothing in the Faragher record, however, shows that Terry had authority to take such actions himself. Faragher's complaint alleged that Terry said he would never promote a female lifeguard to the rank of lieutenant, 524 U.S., at 780, 118 S.Ct. 2275, but that statement hardly suffices to establish that he had ultimate promotional authority. Had Boca Raton anticipated the position the Court today announces, the city might have urged classification of Terry as Faragher's superior, but not her "supervisor."

The illustrative cases reached the appellate level after grants of summary judgment in favor of the employer. Like the Courts of Appeals in each case, I recount the facts in the light most favorable to the employee, the nonmoving party.

The Court misses the point of the illustrations. See ante, at 2453, and nn. 15-16. Even under a vicarious liability rule, the Court points out, employers might escape liability for reasons other than the harasser's status as supervisor. For example, Rhodes might have avoided summary judgment in favor of her employer; even so, it would have been open to the employer to raise and prove to a jury the Faragher/ Ellerth affirmative defense, see supra, at 2439 - 2440. No doubt other barriers also might impede an employee from prevailing, for example, Whitten's and Starke's intervening bankruptcies, see Whitten v. Fred's Inc., No. 8:08-0218-HMH-BHH, 2010 WL 2757005 (D.S.C., July 12, 2010) ; EEOC v. CRST Van Expedited, Inc., 679 F.3d 657, 678, and n. 14 (C.A.8 2012), or Mack's withdrawal of her complaint for reasons not apparent from the record, see ante, at 2453, n. 16. That, however, is no reason to restrict the definition of supervisor in a way that leaves out those genuinely in charge.

Respondent's amici maintain that the EEOC Guidance is ineligible for deference under Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), because it interprets Faragher and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), not the text of Title VII. See Brief for Society for Human Resource Management et al. 11-16. They are mistaken. The EEOC Guidance rests on the employer liability framework set forth in Faragher and Ellerth, but both the framework and EEOC Guidance construe the term "agent" in 42 U.S.C. § 2000e(b).

Even the Seventh Circuit, whose definition of supervisor the Court adopts in large measure, has candidly acknowledged that, under its definition, supervisor status is not a clear and certain thing. See Doe v. Oberweis Dairy, 456 F.3d 704, 717 (2006) ("The difficulty of classification in this case arises from the fact that Nayman, the shift supervisor, was in between the paradigmatic classes [of supervisor and co-worker]. He had supervisory responsibility in the sense of authority to direct the work of the [ice-cream] scoopers, and he was even authorized to issue disciplinary write-ups, but he had no authority to fire them. He was either an elevated coworker or a diminished supervisor.").

The Court worries that the EEOC's definition of supervisor will confound jurors who must first determine whether the harasser is a supervisor and second apply the correct employer liability standard. Ante, at 2451, and nn. 13, 14. But the Court can point to no evidence that jury instructions on supervisor status in jurisdictions following the EEOC Guidance have in fact proved unworkable or confusing to jurors. Moreover, under the Court's definition of supervisor, jurors in many cases will be obliged to determine, as a threshold question, whether the alleged harasser possessed supervisory authority. See supra, at 2446 - 2447.

Nor is the Court's confinement of supervisor status needed to deter insubstantial claims. Under the EEOC Guidance, a plaintiff must meet the threshold requirement of actionable harassment and then show that her supervisor's authority was of "sufficient magnitude" to assist in the harassment. See EEOC Guidance 405:7652, 405:7654.

In addition to concluding that Davis was not Vance's supervisor, the District Court held that the conduct Vance alleged was "neither sufficiently severe nor pervasive to be considered objectively hostile for the purposes of Title VII." App. to Pet. for Cert. 66a. The Seventh Circuit declined to address this issue. See 646 F.3d 461, 471 (2011). If the case were remanded, the Court of Appeals could resolve the hostile environment issue first, and then, if necessary, Davis' status as supervisor or co-worker.

The Court agrees that Davis "would probably not qualify" as Vance's supervisor under the EEOC's definition. Ante, at 2453 - 2454. Then why, one might ask, does the Court nevertheless reach out to announce its restrictive standard in this case, one in which all parties, including the defendant-employer, accept the fitness for Title VII of the EEOC's Guidance? Seesupra, at 2456 - 2457.